# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
------------------------------x
                              :
DANIEL KHESIN                 :    Civ. No. 3:20CV01361(SALM)
                              :
v.                            :
                              :
AETNA LIFE INSURANCE COMPANY  :
and HARTFORD LIFE AND         :
ACCIDENT INSURANCE COMPANY    :    July 20, 2022
                              :
------------------------------x
```

## MEMORANDUM OF DECISION

Plaintiff Daniel Khesin ("plaintiff") has brought this action pursuant to the Employee Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. §1132(e). See Doc. #1. Plaintiff seeks judicial review of the denial by Hartford Life and Accident Insurance Company ("Hartford" or "defendant")[1] of his claim for a waiver of the premium for life insurance benefits ("LWOP benefits") under a group life insurance plan in which plaintiff participated. See generally id.

The parties agreed to a bench trial on a stipulated record and the written briefing pursuant to Rule 52 of the Federal Rules of Civil Procedure. See Doc. #44. The parties filed

---

[1] The parties each represent that during the underlying administrative proceedings, Hartford acquired Aetna Life Insurance Company's ("Aetna") group benefits business. See Doc. #54 at 7, n.1; Doc. #53 at 1. Hartford is now acting on behalf of Aetna as its attorney-in-fact. See Doc. #54 at 7, n.1. For purposes of this Ruling, the Court refers only to Hartford as the defendant.

opening trial memoranda on October 22, 2021 [Docs. #53, #54], to which separate responses were filed [Docs. #63, #64]. Each party has also filed a reply brief. [Docs. #66, #67]. A bench trial was held on April 11, 2022, at which counsel confirmed their clients' consent to a bench trial on the written submissions and waived the right to call witnesses. See O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 642 F.3d 110, 116 (2d Cir. 2011).

Upon consideration of the parties' written briefing, the stipulated record [Doc. #58], the oral argument of counsel, and for the reasons set forth below, the Court **AFFIRMS** defendant's decision to deny LWOP benefits.

## I.   Findings of Fact

Defendant sets forth a comprehensive statement of facts in its opening trial memorandum. See Doc. #54 at 8-27.[2] Plaintiff states that he "has no quarrel with the facts recited in Defendant's statement." Doc. #63 at 2. The following findings of fact are based upon the stipulated record. [Doc. #58].[3]

---

[2] The Court's citations to documents, except for the administrative record [Doc. #58], refer to the page numbers reflected in the document's ECF heading.

[3] The Court cites to the Bates numbering as reflected in the administrative record. See Doc. #58.

A.   Administrative Background and Policy

Plaintiff served as the "Founder and Innovator" of DS Healthcare Group, Inc. until July 13, 2017, at which time he alleges he became disabled by neuromyelitis optica ("NMO"), also known as Devic's Disease. STD1344-58; see also STD171, STD204, AR2513.[4]

ADP TotalSource, Inc. provided DS Healthcare's employees, including plaintiff, with life insurance benefits under Group Policy Number GP-866285 ("Life Policy"), and Long Term Disability Benefits under Group Number GP-866287 ("LTD Policy"). See PW57; AR117. On August 21, 2017, plaintiff applied for Short Term Disability ("STD") benefits, claiming to have been unable to work since July 13, 2017. See STD171, STD204. Shortly thereafter, on September 27, 2017, plaintiff applied for Long Term Disability ("LTD") benefits. See STD1362.

Defendant "initiated a Life Insurance Premium Waiver on [plaintiff's] behalf based upon notification by [its] Long Term Disability department." PW223. Plaintiff's claim for LWOP benefits was initially denied by letter dated May 8, 2018. See id. Plaintiff's claim for LTD benefits was also denied around this time. See id. The May 8, 2018, letter stated: "[I]f you are

---

[4] Plaintiff's application for LWOP benefits, and other documents in the record, state that plaintiff was the company's "President[.]" STD662, AR2513.

approved at some point in the future for LTD benefits, you are not automatically approved for [LWOP] benefits. We will again review your claim file for this benefit." Id. Plaintiff successfully appealed the denial of his LTD claim, resulting in a re-review of plaintiff's LWOP claim.[5] See AR543.

By letter dated December 19, 2018, Hartford denied plaintiff's LWOP claim. See PW230-32. Plaintiff appealed the denial, see PW444-48, which was upheld by letter dated September 10, 2019. See PW311-13. In relevant part, defendant determined that plaintiff had "full-time sedentary work capacity over an 8 hour day" with provided restrictions. PW312. Defendant concluded that the documentation submitted in support of the LWOP claim failed to "support the severity of features to preclude part-time work and any and all reasonable work indefinitely." Id. Because plaintiff did not establish that he was "permanently and totally disabled from any reasonable job for the remainder of his lifetime[,]" defendant "maintain[ed] [its] denial." Id. Plaintiff now seeks review of that determination.

The Life Policy states, in pertinent part:

In the event you become disabled as the result of a disease or injury, you may be eligible for a permanent and total disability benefit if Aetna determines that you are permanently and totally disabled. You will not have to make any further contributions for life

---

[5] The LTD Policy and the Life Policy define "disabled" differently. Compare AR123 and AR139-140 (LTD Policy), with PW86 (Life Policy).

insurance coverage, and your employer will not have to
make premium payments on your behalf.

PW86 (emphases removed). Under the Life Policy, someone is

considered permanently and totally disabled under this plan
if disease or injury prevents you from:
- ▪ Working at your own job or any other job for pay or
  profit; and
- ▪ Being able to work at any reasonable job. A
  "reasonable job" is any job for pay or profit which
  you are, or may reasonably become, qualified for by
  education, training, or experience.

PW86 (emphasis removed).

The Life Policy provides defendant with "discretionary

authority to determine whether and to what extent eligible

employees and beneficiaries are entitled to benefits and to

construe any disputed or doubtful terms under th[e] Policy[.]"

PW73.

B.   Diagnosis and Treatment

NMO is

a central nervous system disorder that primarily affects
the eye nerves (optic neuritis) and the spinal cord
(myelitis). ... It occurs when [the] body's immune
system reacts against its own cells in the central
nervous system, mainly in the optic nerves and spinal
cord, but sometimes in the brain.

...

Neuromyelitis optica can cause blindness in one or both
eyes, weakness or paralysis in the legs or arms, painful
spasms, loss of sensation, uncontrollable vomiting and
hiccups, and bladder or bowel dysfunction from spinal
cord damage.

Doc. #53 at 1; see also Doc. #54 at 11, n.3-4.

Plaintiff first exhibited symptoms of NMO in 2009, when he was hospitalized after an acute demyelinating attack. See STD625-27. In 2009, plaintiff reported symptoms including: leg cramps when walking; incontinence; and numbness or shooting pain in the extremities. See STD553. After several lengthy hospital stays in 2009, during which plaintiff suffered from paralysis and extreme pain, plaintiff began a chemotherapy regimen (Rituxin) to help prevent the recurrence of future acute demyelinating attacks. See generally STD535-76; STD621-659; STD1258-74; AR2490. Plaintiff has since received semi-annual infusions of Rituxin, which enabled him to work until July 2017 with "base line residual symptoms since his demyelinating episodes." PW457. Since 2009, plaintiff has treated his NMO with a number of specialists.

### 1. Dr. André

For mental health symptoms, plaintiff saw Dr. Pierre André, who treated plaintiff with various prescription medications including Adderall and Klonopin. See STD409. Mental status examinations conducted by Dr. André in 2017 were unremarkable. See STD414, STD416, STD418, STD422. On May 5, 2017, Dr. André noted that plaintiff was "stable[.]" STD414. The recurring theme throughout Dr. André's treatment notes was plaintiff's worries over business and legal issues. See STD412, STD416, STD418.

### 2. Dr. Ortega

Following his initial NMO diagnosis, plaintiff primarily treated with Dr. William Sheremata, a neurologist with the University of Miami Health System. See STD1523. After Dr. Sheremata's death, plaintiff began treating with another neurologist, Dr. Melissa Ortega, in October 2017. See id.; see also STD328.

On November 14, 2017, plaintiff reported concerns that his NMO symptoms were progressing. See STD328. A neurological exam on this date was largely unremarkable except plaintiff exhibited "[d]ecreased [sensation] in left leg from waist down. No proprioception in left great toe. ... Romberg sign shows sway with eyes closed. Gait is mildly wide based and slower ... compared to last visit[.]" STD330. Dr. Ortega noted that plaintiff "has had baseline residual symptoms since his initial demyelinating episodes. However, he has had significant progression in his symptoms over the past year." Id.

Dr. Ortega's November 14, 2017, assessment noted that an "MRI of the thoracic cord from 11/15/2017 compared to prior imaging show[ed] 'New areas of volume loss involving the midthoracic spine[.]'" Id.[6] Dr. Ortega concluded that plaintiff's

> symptoms, exam and imaging suggest a progressive myelopathy with worsening gait, balance, urinary and

___

[6] An MRI of plaintiff's brain and orbits taken on December 6, 2017, was "unremarkable." AR2602.

> sexual dysfunction, sensory loss and neuropathic pain.
> This suggests he has a type of neuromyelitis optica that
> is likely entering a secondary progressive clinical
> course which has been described in the past.

STD330-31. Dr. Ortega also noted plaintiff's "complaints of poor
concentration[.]" STD331. Dr. Ortega stated that plaintiff was
"disabled from neuromyelitis optic and will continue to
neurologically decline[.]" Id. (sic).

Plaintiff next saw Dr. Ortega on February 1, 2018, at which
time he reported that he continued "to not feel well." STD334.
Plaintiff reported "constant stabbing pains in his legs[,]"
"severe fatigue[,]" "some episodes of incontinence[,]" and "poor
concentration[.]" Id. Dr. Ortega's report of her examination of
plaintiff on this date was nearly identical to that of the
November 14, 2017, examination. See STD335.

Plaintiff next saw Dr. Ortega on May 15, 2018. See AR2601-
02. Plaintiff continued to complain of "severe chronic
fatigue[]" and "constant stabbing pains in his legs that do not
respond to treatment." AR2602. Plaintiff also reported "poor
concentration[.]" Id. The report of Dr. Ortega's examination of
plaintiff on this date remained largely unchanged from that of
the February 1, 2018, examination. See AR2604; see also PW585.
Dr. Ortega recommended that plaintiff continue with the "Rituxin
infusions every 6 months." AR2604.

### 3. *Dr. Berkower*

For pain management, plaintiff treated with Dr. David Berkower. See STD350-73, STD1276, STD1550-62; see also PW409-16, PW477-500.

The first record of plaintiff's treatment with Dr. Berkower is dated February 24, 2017. See STD1560-62. During this visit, plaintiff complained that his pain had not been well controlled with medication. See STD1560. On examination, plaintiff "demonstrated a mildly antalgic gait[,]" but "[t]he range of motion in the lumbar spine [was] within functional limits." STD1560-61. Other than no proprioception in plaintiff's left leg and a loss of proprioception in plaintiff's left foot, Dr. Berkower's physical examination of plaintiff was largely intact. See STD1561. Plaintiff's treatment with Dr. Berkower on April 5, 2017, and June 28, 2017, reflected similar complaints and findings on examination as those recorded on February 24, 2017. See STD1557-59, STD1554-56.

During plaintiff's August 22, 2017, visit with Dr. Berkower, plaintiff stated that "the chemotherapy has made him very tired[]" and that he did "not feel he can work and wants to take some time off for at least six months." STD1550. The report of Dr. Berkower's examination of plaintiff on this date reflected findings similar to those previously recorded. See STD1551.

Plaintiff next saw Dr. Berkower on September 18, 2017, at which time plaintiff reported that "[t]he belbuca 750mcg does help him." STD370. Plaintiff reported feeling "very tired[,]" with "clouded thinking[.]" Id. Plaintiff also stated that he experienced "chronic pain mainly in his left leg[,]" "numbness in both legs all the time[,]" and "pain in his eyes especially when working on his computer." Id. The report of Dr. Berkower's examination of plaintiff on this date reflected findings similar to prior examinations. See STD371.

The progress notes of plaintiff's visits with Dr. Berkower on October 16, 2017, November 7, 2017, and December 29, 2017, reflected findings similar to the September 18, 2017, progress note. See STD366-68, STD362-65, STD358-61.

Plaintiff saw Dr. Berkower on January 22, 2018, and complained that "[h]is pain has not been well controlled. The belbuca 900 mcg does help him but not enough." STD354 (sic). Plaintiff's other complaints largely remained the same as those recorded in 2017. See id. The report of Dr. Berkower's examination of plaintiff on this date reflected findings similar to the 2017 physical examinations. See STD355.

Plaintiff next saw Dr. Berkower on February 6, 2018. See STD350. During this visit, plaintiff complained that "[h]e cannot focus with his belbuca 1200mcg. However, it helps him a great deal with his pain. He also has bladder incontinence twice

a week. His balance is poor and can't put on normal shoes. He is in bed most of the day secondary to the pain." STD350 (sic). The report of Dr. Berkower's examination of plaintiff on this date reflected findings similar to prior examinations. See STD351.

The next record of plaintiff's treatment with Dr. Berkower is dated more than fifteen months later, on May 13, 2019. See PW413. Plaintiff's complaints during this visit reiterated those made during the February 6, 2018, visit. See id. At this time, plaintiff remained on 1200mcg of Belbuca. See id. The report of Dr. Berkower's examination of plaintiff on this date reflected findings similar to prior examinations. See PW414.

The progress note of plaintiff's visit with Dr. Berkower on July 23, 2019, is substantially similar to that for the May 13, 2019, visit. See PW409-11.

### 4.   *Dr. Lynne*

For his complaints of incontinence, plaintiff met with a urologist, Dr. Charles M. Lynne, on December 14, 2017. See STD406. During this appointment, plaintiff reported "that of over the past 6 months, he gets occasional episodes of precipitous urgency and urge incontinence." Id. (sic). Plaintiff was "not very receptive to the idea of really any testing[,]" but agreed to an ultrasound of his kidneys and bladder. Id.

In May 2018, plaintiff reported to Dr. Ortega that despite his complaints of "urinary urgency," plaintiff did "not want

further testing with the urologist." PW590.

C.   <u>Treating Physician Opinions & Plaintiff's Other Evidence</u>

Plaintiff's treating physicians provided opinions and other statements in support of plaintiff's claim for benefits. This evidence is summarized below.

1.   *Dr. André*

Dr. André completed an "Attending Provider Statement" dated August 29, 2017, which stated, in relevant part, that plaintiff "can not sit or stand for very long" and noted plaintiff's chronic fatigue "due to Devic's Disease[.]" STD1525 (sic). Dr. André did not comment on plaintiff's mental functional capacity.

2.   *Dr. Ortega*

On October 18, 2017, Dr. Ortega submitted a letter on plaintiff's behalf stating that plaintiff was "not only incapable of working at his former job, but incapable of working at any job[]" because of: "Memory loss, Fatigability, on/off motor fluctuations, lower extremity spasticity loss of coordination and walking difficulties[.]" STD1413. Dr. Ortega noted the "progressive" nature of plaintiff's condition in this letter. <u>Id.</u>

Dr. Ortega completed a Medical Opinion Form dated February 26, 2018, stating in relevant part that plaintiff suffered from "[e]xtreme" pain that "would interfere with his ... reliably

12

attending" a regular work week, and would also interfere with
his concentration or memory "daily for several hours a day[.]"
STD326.

On February 28, 2018, plaintiff's counsel conducted a
"telephonic sworn statement" of Dr. Ortga. AR2485. As of that
date, Dr. Ortega had seen plaintiff on just three occasions. See
AR2491. Dr. Ortega described plaintiff's "main" symptoms of
Devic's Disease as: "[H]e has loss of balance. He has some loss
of sensation in his lower extremities. He has severe chronic
nerve pain in his legs. He has increased urinary urgency and
episodes of urinary incontinence. He has erectile dysfunction.
He's had some chronic fatigue. He's complained of poor
concentration." Id. Dr. Ortega opined that recent examinations
of plaintiff suggested that "there may be underlying progression
of his disease[.]" AR2494. Dr. Ortega also noted that the
limited sensation in plaintiff's left leg had "been a long-
standing symptom ... since he first had his attack." AR2498. Dr.
Ortega reiterated her opinion that plaintiff would not be able
to maintain 40-hour per week employment due to his chronic pain,
incontinence, and inability to concentrate. See AR2500-01.

In a July 2018 sworn statement, Dr. Ortega confirmed that
the November 2017 MRI was, in her opinion, "objective evidence
of the progression of [plaintiff's] disease[.]" PW584.

   3.   *Dr. Berkower*

Dr. Berkower submitted two letters on behalf of plaintiff. The first letter is dated August 23, 2017, and states in relevant part: Plaintiff "has ongoing disability with total lack of proprioception in his left leg and chronic pain. ... He has had worsening pain with his Rituxin chemotherapy treatments. He requires chronic pain medications that also affects him mentally. On account of this, I feel he is unable to work at this time." STD1276. The second letter is dated October 12, 2017, and states, in relevant part, that Dr. Berkower did "not anticipate that [plaintiff] will improve to the point of being able to return to work in the foreseeable future, if ever." STD1414.

Dr. Berkower completed an "Attending Provider Statement" dated August 28, 2017. STD1359. Dr. Berkower stated that plaintiff "cannot sit or stand for very long. He suffers from chronic fatigue and pain. He has difficulty driving + walking. Mentally he has difficult time focusing. He can do activities for a short period of time." Id. Plaintiff's treatment plan included, in addition to medication, "Exercise Daily at Home." Id. (sic).

Dr. Berkower completed a Medical Opinion Form dated March 18, 2018, stating that plaintiff suffered from "Moderately Severe" pain that "would interfere with his ... reliably

14

attending" a regular work week, and would also interfere with
his concentration or memory "daily for several hours a day[.]"
PW614 (sic).

Three days later, on March 21, 2018, plaintiff's counsel
conducted a "sworn statement via telephone" of Dr. Berkower.
STD338. During this interview, Dr. Berkower noted that plaintiff
had recently been experiencing "increased pain and difficulty
concentrating," which "kep[t] him on the pain medications[.]"
STD341. Dr. Berkower stated that plaintiff was then taking
Belbuca for pain, and Oxycodone for break-through pain. See
STD342. Dr. Berkower stated that plaintiff's "pain level waxes
and wanes[]" between moderate and severe, but that "the pain
medications ... allow[] the pain level to significantly
stabilize," STD343, such that plaintiff is "able to live his
life[.]" STD344. Dr. Berkower concluded: "I think with the
waxing and waning and the incontinence, the concentration
issues, the fatigue issues, I just don't see how he would be
able to function on a 40-hour type job on a regular basis."
STD346-47 (sic).

4.   *Dr. Craig Lichtblau*

Dr. Craig Lichtblau prepared a "Comprehensive
Rehabilitation Evaluation" dated May 15, 2019. PW686-818. This
report contains a medical evaluation, which includes a
comprehensive medical history and the results of a physical

examination. See PW687-92. On examination, plaintiff ambulated with a normal gait; had decreased proprioception in his left foot; and a positive Romberg sign with his eyes closed. See PW691-62. Otherwise, the examination was largely unremarkable. See id. Dr. Lichtblau also performed a "Medical Functional Capacity Assessment" as part of his report. PW695; see also PW696-PW730.

Following the assessment, Dr. Lichtblau completed a "Medical Functional Capacity Opinion[.]" PW732. The opinion noted that during the assessment, plaintiff "was able to maintain concentration adequately." PW733. Dr. Lichtblau stated his

> belief that Daniel Khesin does not have the functional capacity to work 4 hours per day on an uninterrupted basis at this time. He should be in a setting which allows him to take breaks to change positions from sit-to-stand/stand-to-sit frequently at will for positional comfort. He may sit, stand, and walk as tolerated.
>
> The patient may perform bending, twisting, climbing protected heights (i.e. stairs with rails and ramps with rails), repetitive reaching overhead, repetitive movements of elbow (handling), pushing and pulling.
>
> The patient should avoid repetitive bending, kneeling, squatting, crawling, climbing unprotected heights (i.e. ladders, poles, and scaffolding), running, and jumping.
>
> This patient should always observe appropriate body mechanics which includes, but is not limited to, never bending at his waist while keeping his hips and knees extended.
>
> The Medical Functional Capacity Assessment conducted on Daniel Khesin's behalf indicates an estimated residual

16

physical functioning strength level from the hips-to-shoulders position to be Sedentary Light as defined by the U.S. Department of Labor.

It should be understood this patient is going to suffer from acute, intermittent exacerbations of pain and discomfort and, when he/she experiences acute, intermittent exacerbations of pain and discomfort, he/she will have good days, bad days, and missed days of work.

It is my medical opinion as a Board Certified Physiatrist that this patient will not be able to maintain gainful employment in the competitive open labor market or in a sheltered environment with a benevolent employer secondary to acute, intermittent exacerbations of chronic pain.

PW733-34.

### 5.   *Vocational Evaluation*

Mark Boatner, M.Ed., CRC, completed a Vocational Evaluation dated July 6, 2018. See PW616-23. To prepare this evaluation, Mr. Boatner relied on evidence supplied by plaintiff's attorney. See PW616.

Mr. Boatner first conducted "a detailed occupational analysis to determine [plaintiff's] pre-disability occupation[.]" PW616-17; see also PW616-619. Mr. Boatner concluded that plaintiff's "occupation when his disability began was that of, 'Chemical Laboratory Chief ... SVP 8, skilled; light strength'." PW618. Mr. Boatner reviewed "the restrictions Aetna has found reasonable[,]" PW619, and concluded that plaintiff was "not capable of returning to the last job that he held[.]" PW620.

Mr. Boatner also "review[ed] the opinions of Drs. Berkower and Ortega and provide[d his] vocational opinion about whether [plaintiff] could return to his previous occupation with the restrictions they provide." Id. Based on Dr. Berkower's Medical Opinion Form, Mr. Boatner concluded that "a person limited to the extent and in the ways described by [Dr. Berkower] could not be reasonably capable or able to meet expectations of any full-time or part-time job including his immediate or other past relevant work as well as all of the entry level jobs." PW620-21.

Similarly, based on the Medical Opinion Form completed by Dr. Ortega, Mr. Boatner concluded that plaintiff "would be unable to perform any of his past relevant work or to perform any regularly defined full-time or part-time job that exists in the national economy." PW621.

Mr. Boatner concluded that plaintiff

does not retain the physical and/or cognitive capability necessary to sustain his past highly complex and detailed job or any, regularly defined job that requires attention, meeting production rate norms and attending on a full-time, 8-hour a day, 40-hour a week basis for 52 weeks a year. Furthermore, he does not possess the necessary physical demand characteristics to perform any regularly defined semiskilled or unskilled job that exists in the national economy.

PW623.

D.   Peer Review Evidence

Defendant engaged several consultants to conduct peer and clinical reviews of plaintiff's records.

> 1. *Dr. Snyder*

On November 21, 2017, Dr. Michael D. Snyder, a specialist in neurology, conducted a Physician Review of Claim Data on behalf of defendant. See STD459-468. In addition to reviewing plaintiff's medical and other records, Dr. Snyder spoke with Dr. Berkower and Dr. Ortega, each of whom reiterated the opinion that plaintiff was unable to work in any capacity. See STD464-65.

Following his review, Dr. Snyder concluded: "There is no clinical evidence to support a functional impairment which would preclude the claimant from performing any activity, effective 7/13/2017 to present[.]" STD466. Specifically, Dr. Snyder concluded that plaintiff "would be expected to be capable of full-time employment with restrictions and limitations." Id.

Dr. Snyder reasoned, in relevant part, that plaintiff "had remained functional and employed for several years with [his] symptoms, and there is no objective documentation from the submitted clinical records that his condition has appreciably changed recently to render him impaired." STD467; see also id. ("[F]rom the clinical information, these deficits have been static and not progressive, and the claimant had progressively remained employed for several years with these deficits."). Dr. Snyder also "noted" plaintiff's "reports of chronic fatigue and cognitive symptoms[,]" but found that such complaints were "not

substantiated by objective findings or documentation." STD466.

### 2.   Dr. Critchfield

On November 19, 2018, Dr. Eden Critchfield, a specialist in neuropsychology, completed a Physician Review of Claim Data on behalf of defendant. See PW245-54. Dr. Critchfield found that "[t]he available medical records indicate the claimant's difficulties with concentration and psychiatric symptoms are longstanding, and present during time periods when the claimant has been able to maintain employment." PW253. Accordingly Dr. Critchfield concluded: "From a neuropsychology perspective, the available medical records do not support cognitive or psychiatric symptoms of a severity to result in any functional impairment or that would impede his ability to work 8 hours per day/40 hours per week." PW254 (sic).

### 3.   Dr. Emad

On November 19, 2018, Dr. Behzad Emad, who is board certified in physical medicine and rehabilitation, completed a Physician Review of Claim Data on behalf of defendant. See PW256-66. As part of his review, Dr. Emad spoke with Dr. Ortega on November 16, 2018, who "**agreed that [plaintiff] has the capability to perform full time duty with the provided restrictions and limitations**." PW263 (emphasis added).

Dr. Emad concluded that plaintiff was "able to sustain full time duty, 8 hours per day, 5 days per week with permanent

restrictions and limitations from 7/13/2017 through 10/12/2017
and from 10/13/2017 forward." PW263 (sic); see also PW263-64
(listing limitations and restrictions). Dr. Emad explained:
"[T]here is no documentation indicative of an incapacitating
physical limitation that would preclude the claimant from
perform fulltime duty." PW264 (sic).

### 4. Dr. Kroski

Dr. William J. Kroski, who is board certified in physical
medicine and rehabilitation, with a subspecialty certificate in
pain medicine, completed a Physician Review of Claim Data on
appeal. See PW821-27. As part of his review, Dr. Kroski spoke
with Dr. Berkower on July 15, 2019. See PW824. Dr. Berkower did
not agree that plaintiff could return to work with restrictions.
See PW825. Dr. Kroski did not speak with Dr. Ortega, who was
"out of the country[.]" PW824.

After identifying "reasonable restrictions and
limitations[,]" PW825, Dr. Kroski concluded that plaintiff
"would be expected to sustain fulltime capacity over an eight
hour workday for 40 hours per week for the time period of
7/13/17 and beyond." PW826. However, "[d]ue to the progression
of his symptoms," Dr. Kroski stated that "it would be reasonable
to re-evaluate" the assigned limitations and restrictions in
four to six months from the date of his review. Id.

21

5. *Dr. Hertza*

Dr. Jeremy Hertza, a specialist in clinical neuropsychology, also completed a Physician Review of Claim Data on behalf of defendant. See PW829-37. Dr. Hertza concluded: "Given unremarkable mental status exams, no formal assessment, and no indication of high level psychological or cognitive related care, I find that the available medical record does not support functional impairment, from a neuropsychological perspective, from 7/13/2017 through present." PW835. Dr. Hertza determined that plaintiff "would be expected to have sustained capacity in at least 3 consecutive hours per day for the time period of ... 7/13/2017 and beyond." Id.[7]

## II. **Standard of Review**

A court will "review a plan administrator's decision de novo unless the plan vests the administrator with discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case we use an abuse of discretion standard." Nichols v. Prudential Ins. Co. of Am., 406 F.3d 98, 108 (2d Cir. 2005) (citation and quotation marks omitted). Here, the Life Policy provides Hartford with "discretionary authority to determine whether and to what extent

---

[7] Two nurses also conducted reviews of the claim file and similarly concluded that plaintiff had work capacity. See AR2757-68, AR2543-49.

eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms under th[e] Policy[.]" PW73. Accordingly, because the "written plan documents confer upon [the] plan administrator the discretionary authority to determine eligibility, [the Court] will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." Hobson v. Metro. Life Ins. Co., 574 F.3d 75, 82 (2d Cir. 2009) (citation and quotation marks omitted).[8]

Under this standard of review, the Court may reverse a "decision to deny ERISA benefits only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law." Id. at 83 (citation and quotation marks omitted). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." Plitnick v. Fussell, 601 F. Supp. 2d 470, 478 (D. Conn. 2009) (citation and quotation marks omitted).

The Court's "scope of review is narrow[,]" and it may not "substitute [its] judgment for that of the insurer as if [the Court] were considering the issue of eligibility anew." Hobson

---

[8] Although "[p]laintiff does not believe that standard of review is an outcome determinative issue[,]" counsel for plaintiff conceded at oral argument that the arbitrary and capricious standard applies to the Court's review of this case. Doc. #53 at 11 n.3.

574 F.3d at 83-84 (citation and quotation marks omitted).
Ultimately, the Court must determine whether Hartford "had a
reasonable basis for the decision that it made." Id. at 89
(citation and quotation marks omitted).

"It is an ERISA claimant's burden to establish an
entitlement to benefits, and administrators may exercise their
discretion in determining whether a claimant's evidence is
sufficient to support his claim." Whelehan v. Bank of Am.
Pension Plan for Legacy Companies-Fleet-Traditional Ben., 621 F.
App'x 70, 71-72 (2d Cir. 2015) (citation and quotation marks
omitted).

## III. **Conclusions of Law**

Plaintiff challenges Hartford's decision to deny LWOP
benefits on two basic theories. First, plaintiff asserts that
based on the evidence presented, he is disabled under the terms
of the policy. See Doc. #53 at 13-17. Second, plaintiff asserts
that Hartford acted in an arbitrary and capricious manner by
relying on the opinions of the non-examining consultants over
those of plaintiff's treating physicians. See id. at 17-20.
Plaintiff also contends, in response to defendant's opening
trial memorandum, that Hartford erred by failing to engage in
any vocational analysis in reaching its decision. See Doc. #63
at 10-11.

Defendant asserts: (1) there is substantial evidence

supporting its decision, see generally Doc. #54; (2) it appropriately considered the opinion evidence of record; see Doc. #64 at 6-16; (3) it was not required to obtain an IME of plaintiff, see id. at 18-21; and (4) it was not required to perform a vocational assessment before denying LWOP benefits, see Doc. #67 at 11-14.

Before addressing plaintiff's contention that he is disabled under the terms of the policy, the Court first considers whether defendant appropriately considered the medical opinion evidence.

A.    Defendant Adequately Considered the Medical Opinion Evidence

Plaintiff contends that defendant acted in an arbitrary and capricious manner by rejecting the opinions of his treating physicians and instead relying on the opinions of the non-examining peer review physicians. See Doc. #53 at 17-22. Plaintiff asserts: (1) defendant "acted arbitrarily to reject consistent opinions of examining sources in favor of its hired non-examining consultants[,]" id. at 18; (2) defendant inappropriately relied on the non-examining peer review physicians when assessing the credibility of plaintiff's pain and fatigue, see id. at 19-20; and (3) defendant "fail[ed] to grapple with the FCE confirming the opinions of Mr. Khesin's treating sources[,]" id. at 20; see also Docs. #63, #66

(asserting further arguments in support of the general proposition that defendants failed to appropriately consider the medical opinion evidence). Defendant contends generally that substantial evidence supports its determination, see generally Doc. #54 at 30-36, and that it appropriately considered the evidence. See generally Doc. #64 at 7-21. The Court addresses each argument in turn.

> 1.   Defendant appropriately relied on the opinions of the non-examining peer review physicians

Plaintiff first contends that it was arbitrary and capricious for defendant "to reject consistent opinions of examining sources in favor of its hired non-examining consultants." Doc. #53 at 18. Defendant responds, in pertinent part, that it "appropriately considered, and is not bound by, plaintiff's treating physicians' attorney-facilitated conclusory opinions[.]" Doc. #64 at 6 (capitalizations altered).

"ERISA requires that benefit plans give a 'full and fair review by the appropriate named fiduciary of the decision denying the claim.'" Demirovic v. Bldg. Serv. 32 B-J Pension Fund, 467 F.3d 208, 212 (2d Cir. 2006) (quoting 29 U.S.C. §1133(2)). "Plan administrators[] ... may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). However, plan administrators are

not required "to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Id. (footnote omitted); accord Demirovic, 467 F.3d at 212 ("[A] plan need not accord the insured's treating physician greater deference than a plan's retained physician.").

Plaintiff concedes that "[t]here is no 'treating physician rule'" applicable to ERISA claims. Doc. #53 at 17. Nevertheless, plaintiff contends that defendant acted arbitrarily and capriciously by rejecting the opinions of his treating physicians, Dr. Ortega and Dr. Berkower, because those opinions are consistent with each other and supported by the record. See id. at 17-19. Defendant asserts that the opinions of Dr. Ortega and Dr. Berkower are "unsupported and contradicted by their own clinical reports[.]" Doc. #54 at 31; see also Doc. #64 at 8-9. The Court first addresses the opinion of Dr. Ortega.

a.    Dr. Ortega

Dr. Ortega submitted a letter dated October 18, 2017, stating that plaintiff was "unable to work at any job due to the debilitating manifestations and progression of his diagnosis[.]" STD1413. She also submitted a Medical Opinion Form dated February 26, 2018, which essentially reiterated that plaintiff was disabled from performing any work. See STD326. It was not

unreasonable for defendant to reject these opinions given that, during a telephone discussion with Dr. Emad on November 16, 2018, Dr. Ortega "agreed [with Dr. Emad] that [plaintiff] has the capacity to perform full time duty with the provided restrictions and limitations." PW263. This directly contradicts Dr. Ortega's October 2017 letter, February 2018 opinion, and July 2018 sworn statement. See PW326; PW582-87.

After Dr. Emad "explained the medical records which [he] reviewed[,]" PW262, Dr. Ortega agreed with Dr. Emad's opinion, which was adopted by defendant in its initial denial letter. See PW231. Curiously, neither plaintiff nor defendant mentions this in their briefing, but it is significant to the Court's analysis that Dr. Ortega changed her opinion completely after Dr. Emad presented her with a proposed set of functional restrictions and limitations applicable to plaintiff's circumstances.[9]

Additionally, as defendant contends, the medical evidence of record simply does not support Dr. Ortega's initial opinion of total disability. The limited treatment history plaintiff had with Dr. Ortega reflected largely unremarkable findings on examination, including normal muscle tone, no atrophy, and full strength. See generally STD330, STD335, AR2604. The deficits

---

[9] While this fact is significant to the Court's analysis, it is not dispositive. The Court would reach the same conclusion even without this information.

observed during her examinations of plaintiff, including
decreased sensation in the left leg and a "mildly wide based"
and slow gait, do not support a finding that plaintiff was
unable to perform any work. Id. Indeed, Dr. Ortega stated under
oath that plaintiff's decreased sensation in his left leg/foot
had "been a long-standing symptom, ... even since he first had
his attack." AR2498. The first demyelinating attack occurred in
2009. See STD625-27. Accordingly, it is reasonable to infer that
plaintiff was able to work from 2009 through 2017 even while
suffering from such symptoms. This is acknowledged by several of
the peer review physicians in their respective opinions. See
STD467 (Dr. Snyder: "This claimant has had fixed neurological
deficits since 2009 related to prior transverse myelitis due to
NMO. The claimant's NMO has apparently remained in remission
without further relapses on rituximab. ... However, it is
important to point out that the claimant continued to work with
these static deficits for several years."); PW253 (Dr.
Critchfield: "The available medical records indicate the
claimant's difficulties with concentration and psychiatric
symptoms are longstanding, and present during time periods when
the claimant has been able to maintain employment.").

Accordingly, substantial evidence supports defendant's
rejection of Dr. Ortega's opinion that plaintiff was disabled
from performing any work. There is "nothing in the record

indicat[ing] that [defendant] arbitrarily refused to credit [plaintiff's] medical evidence. [Defendant's] consultants repeatedly attempted to contact [plaintiff's] treating physicians," at least one "of whom concluded that [plaintiff's] diagnoses and conditions did not inhibit h[im] from working." Hobson, 574 F.3d at 90 (alterations added).

> b.   Dr. Berkower

 Dr. Berkower also submitted several opinions asserting that plaintiff was disabled from performing any work. See STD1276, STD1359, STDPW614. It was not arbitrary, or unreasonable, for defendant to reject these opinions.

First, plaintiff's argument that the opinions of his treating providers are consistent with one another is significantly undermined by Dr. Ortega's later statement that plaintiff could work with certain restrictions. See Doc. #66 at 5.

Second, Dr. Berkower's opinion that plaintiff was unable to work due to difficulties with concentration is not supported by objective evidence in the record, and indeed is contradicted by Dr. Lichtblau's FCE. During the assessment with Dr. Lichtblau, plaintiff "was able to maintain attention adequately." PW733. Additionally, although the FCE restricts plaintiff's physical activities, there are no mental restrictions noted. See PW733-34. Even Dr. André, plaintiff's treating psychiatrist, did not

indicate that plaintiff suffered from any mental limitations as
a result of his NMO. See STD1525. As defendant notes, there is
not a single mental status examination of record to support a
finding that plaintiff's difficulties with concentration would
preclude all work.

Last, Dr. Berkower's opinion is not supported by his own
examinations, which largely reflected intact findings that
remained stable over several years of treatment. See Section
I.B.3., supra. Although Dr. Berkower's examinations reflected a
loss of proprioception in plaintiff's left leg and foot, those
findings, according to Dr. Ortega, were "long-standing" and had
been present at the time when plaintiff was maintaining full-
time work. See AR2498. Additionally, those symptoms do not
necessarily support a finding of total disability as defined by
the Life Plan, and have otherwise been adequately accounted for
in defendant's determination of plaintiff's functional capacity.
See PW311-12.

Given the evidence of record, including the opinions of the
peer review physicians, defendant was "not required to accord
the opinions of [plaintiff's] treating physicians 'special
weight,' especially in light of contrary independent physician
reports." Hobson, 574 F.3d at 90 (citing Black & Decker, 538
U.S. at 834). Accordingly, it was not arbitrary or capricious
for defendant to reject the opinions of Dr. Berkower.

c.   Peer Review Physicians

Plaintiff asserts that given the subjective nature of plaintiff's complaints, defendant acted arbitrarily by relying on the peer review physician opinions instead of on the opinions of his treating physicians. See Doc. #53 at 18-20; see also Doc. #63 at 5-9; Doc. #66 at 7-9. Plaintiff also contends that because "pain is the basis of [his] disability[,]" "it was unreasonable for Hartford to rely exclusively on non-examining sources rather than obtaining an IME." Doc. #53 at 20; see also Doc. #63 at 5-8.

Plaintiff asserts that it was arbitrary for defendant to rely on the opinions of Dr. Emad and Dr. Kroski because they "never examined" plaintiff, and therefore "judge[d] the credibility of pain without the benefit of a personal examination[.]" Doc. #53 at 18, 19; see also Doc. #63 at 6. Although Dr. Emad and Dr. Kroski did not examine plaintiff, each explicitly considered plaintiff's subjective complaints of pain, and accounted for those complaints in his determination.

For example, Dr. Emad specifically accounted for plaintiff's "chronic pain" and "chronic fatigue" when determining plaintiff's functional capacity. PW263. He also found that plaintiff's "subjective complaints and reported limitations are consistent with the objective medical evidence." PW264. Dr. Emad came to those conclusions after speaking to Dr.

Ortega, who agreed that plaintiff had "the capability to perform full time duty with the provided restrictions and limitations." PW263.

Similarly, Dr. Kroski noted that plaintiff's "self-reported symptoms as well as clinical findings are supported by progression on imaging of the thoracic spine." PW825; see also PW827.

Dr. Snyder also explicitly considered plaintiff's subjective complaints:

> The claimant's reports of chronic pain are consistent with treatment with pain medication regimen. The claimant's reports of left lower extremity sensory disturbance and gait imbalance are consistent with clinical and radiographic findings due to thoracic myelomalacia. The claimant's reports of chronic fatigue and cognitive symptoms are noted, but are not substantiated by objective findings or documentation.

STD466; see also STD467 ("Although the claimant reports fatigue and cognitive symptoms, there is no objective documentation to substantiate that these complaints are limiting or disabling[.] ... Similarly, although the claimant has chronic pain requiring pharmacologic management, there is no documentation to support impairment from this condition[.]").

Despite plaintiff's claims to the contrary, there is no indication that defendant "disregard[ed] any evidence simply because it is subjective." Doc. #53 at 19. Indeed, "as in Hobson, there is no evidence that [defendant's] independent

experts refused to consider the results of [plaintiff's] in-person examinations or ignored his treating physicians." Hafford, 2017 WL 4083580, at *8. "Plaintiff does not argue that h[is] medical record was in any respect incomplete. As such, The Hartford was entitled to rely on its independent medical reviewers' opinions regarding the Plaintiff's medical records, as well as the opinion of ... h[is] treating neurologist." Beardsley v. Hartford Fire Ins. Co., No. 3:18CV02056(MPS), 2020 WL 5441322, at *10 (D. Conn. Sept. 10, 2020). Accordingly, "the fact that [plaintiff's] treating physicians disagreed with the physicians that [defendant] retained does not, without more, make the decision to deny benefits arbitrary and capricious." DeCesare v. Aetna Life Ins. Co., 95 F. Supp. 3d 458, 488 (S.D.N.Y. 2015).

Finally, given the evidence of record, defendant was not required to obtain an IME. Where, as here, "the ERISA plan administrator retains the discretion to interpret the terms of its plan, the administrator may elect not to conduct an IME, particularly where the claimant's medical evidence on its face fails to establish that []he is disabled." Hobson, 574 F.3d at 91. Here, there was ample evidence from which defendant could make a determination as to plaintiff's eligibility for LWOP benefits, including plaintiff's medical records, five peer review opinions, Dr. Lichtblau's FCE, and the later opinion of

Dr. Ortega, who agreed that plaintiff was capable of working with certain fixed limitations. Accordingly, it was not unreasonable for defendant to rely on the consistent opinions of the peer review physicians without the benefit of an IME because "the Second Circuit has held that a plan sponsor is not required to conduct an in-person examination." Hafford v. Aetna Life Ins. Co., No. 16CV04425(VEC)(SN), 2017 WL 4083580, at *8 (S.D.N.Y. Sept. 13, 2017).

Thus, for the reasons stated, it was not unreasonable for defendant to rely on the opinions of the peer review physicians, or to make its determination without the benefit of an IME.

> ### 2. Defendant adequately considered Dr. Lichtblau's FCE

Plaintiff contends that the "greatest[] flaw in the file reviews relied on by Hartford is that they fail to grapple with the FCE confirming the opinions of Mr. Khesin's treating sources." Doc. #53 at 20. Plaintiff further asserts that defendant "cannot be justified in relying on the opinion of a file reviewer [Dr. Emad] who never knew that the treaters' opinion had been objectively confirmed by an FCE." Id. at 21. Defendant contends, however, that "Dr. Lichtblau's FCE report is consistent with and supportive of Hartford Life's determination." Doc. #64 at 12.

Dr. Lichtblau determined, in relevant part, that plaintiff

did "not have the functional capacity to work 4 hours per day on an uninterrupted basis at this time." PW733 (sic). Dr. Lichtblau placed further restrictions on plaintiff, but ultimately determined that his assessment on plaintiff's "behalf indicates an estimated residual physical functioning strength level from the hips-to-shoulders position to be Sedentary Light[.]" Id. (emphases removed) (sic). Notably, although Dr. Lichtblau's report was drafted in the present tense with respect to plaintiff's functional capacity, Dr. Lichtblau later stated: "It should be understood that this patient is going to suffer from acute, intermittent exacerbations of pain and discomfort and, when he[] experiences acute, intermittent exacerbations of pain and discomfort and, ... he[] will have good days, bad days, and missed days of work." PW734 (emphasis added). Dr. Lichtblau concluded, in his opinion, "that [plaintiff] will not be able to maintain gainful employment ... secondary to acute, intermittent, exacerbations of chronic pain." Id.

Throughout his briefing, plaintiff relies heavily on this report as objective evidence supporting the opinions of Dr. Ortega and Dr. Berkower. However, a reasonable reading of the FCE also supports the peer review physician opinions. First, as defendant observes, Dr. Lichtblau did not opine that plaintiff lacked the functional capacity to perform all work as of the date of his examination. See Doc. #64 at 14. Rather, a

reasonable reading of his report is that plaintiff <u>was</u> able to work, at that time, with breaks. This interpretation is supported by Dr. Lichtblau's statement that plaintiff "should be in a setting which allows him to take breaks[.]" PW733. Additionally, Dr. Lichtblau did not state that plaintiff suffers, in the present tense, "from acute, intermittent exacerbations of pain and discomfort" and as a result has "good days, bad days, and missed days of work." PW734. Rather, this aspect of Dr. Lichtblau's report is phrased in the future tense -- specifically, he predicts that plaintiff "is going to suffer" and "will have good days, bad days, and missed days of work." <u>Id.</u> This suggests that plaintiff may become disabled in the future, but at the time of the report, plaintiff was not then experiencing such extreme limitations. This reading of the report is further confirmed by Dr. Lichtblau's ultimate opinion, again phrased in the future tense, that plaintiff "will not be able to maintain gainful employment." PW734. This phrasing is significant, because the question before defendant was not whether plaintiff <u>would become</u> disabled at some time in the future, but whether he was <u>presently</u> disabled. <u>See</u> PW86.

Several of the limitations reflected in Dr. Lichtblau's FCE are also reflected in the peer review opinions. <u>Compare</u> PW733-34, <u>with</u> PW263-64. Indeed, defendant appears to have credited Dr. Lichtblau's opinion that plaintiff would suffer progressive

symptoms in the future. Defendant specifically stated that "it would be reasonable to re-evaluate these restrictions and limitations in 4-6 months from the date of this review." PW312. See also STD467 (Dr. Snyder opinion that there was a possibility for future decline in plaintiff's symptoms); PW826 (Dr. Emad: "Due to the progression of [plaintiff's] symptoms, it would be reasonable to re-evaluate these restrictions and limitations 4-6 months from the date of this review.").

"Where, as here, the terms of an ERISA Plan give its Administrator the sole and absolute authority to interpret the Plan and determine claimants' eligibility for benefits, the Administrator's determinations are subject to a deferential standard of review, which requires only that the Administrator's decision was not arbitrary or capricious." Holley v. Empire State Carpenters Pension Plan, 865 F. Supp. 2d 352, 354 (W.D.N.Y. 2012). Given the other evidence of record previously discussed, including Dr. Lichtblau's own examination findings, plaintiff has not established by a preponderance of the evidence that defendant failed to adequately consider Dr. Lichtblau's FCE, or that the FCE meaningfully undermines the peer review opinions.

   B.   Defendant Was not Obligated to Obtain a Vocational
        Assessment

In response to defendant's opening trial brief, plaintiff

asserts that defendant acted in an arbitrary and capricious manner by failing to conduct a vocational assessment. See Doc. #63 at 10. Relying on Demirovic, 467 F.3d at 217, plaintiff contends that because defendant did not conduct a vocational assessment, "[a]ny suggestion that [plaintiff], despite his obvious limitations, can nonetheless perform 'any job' must fail." Doc. #63 at 11. In reply, defendant asserts that plaintiff's reading of Demirovic "is wrong[]" because that case "applies to LTD benefits (which insure and replace earnings lost due to sickness or injury), and not to LWOP benefits (which offsets the cost of life insurance premium payments when one is unable to perform any job for any pay or profit)." Doc. #67 at 11 (sic). Defendant asserts: "Demirovic simply does not apply to claims for LWOP benefits." Id. at 13.

In Demirovic, the Second Circuit considered an appeal of a denial of "disability pension benefits" by a fifty-five year old claimant, who "had worked as a night cleaner for some thirty years." Demirovic, 467 F.3d at 209. The benefits at issue in Demirovic "include[d] a monthly pension payment to participants who suffer from a 'total and permanent disability.'" Id. The Summary Plan Description explained: "Total and permanent disability is the inability to work in any capacity, as determined in the discretion of the Trustees or persons they designate. ... [Y]ou must be unable to perform any gainful

employment to be considered totally and permanently disabled under this Plan." Demirovic, 467 F.3d at 209-10 (footnote omitted, alterations added).

The Second Circuit construed the phrase "any gainful employment" as requiring a plan administrator to "show adequate consideration of a claimant's vocational characteristics[]" in addition to "any physical limitations [a claimant's] condition may place on the types of sedentary work she may be able to perform[.]" Id. at 216. In so holding, the Second Circuit reasoned:

> The phrase "any gainful employment" in the context of Demirovic's insurance plan may not reasonably be read as denying benefits to a person who is physically capable of any employment whatsoever, so long as it earns a nominal profit. Nor may it be read as allowing an administrator to disregard a claimant's individual vocational circumstances. To do so would render the plan's promise of a disability pension hollow for all but the most grievously incapacitated claimants, would deprive plan participants of their reasonable expectations, and is arbitrary and capricious. A finding that a claimant is physically capable of sedentary work is meaningless without some consideration of whether she is vocationally qualified to obtain such employment, and to earn a reasonably substantial income from it, rising to the dignity of an income or livelihood, though not necessarily as much as she earned before the disability. This standard reflects the most important purpose of ERISA, which is to assure American workers that they may look forward with anticipation to a retirement with financial security and dignity, and without fear that this period of life will be lacking in the necessities to sustain them as human beings within our society.

Id. at 215 (citation and quotation marks omitted).

Demirovic does not explicitly limit its holding to LTD

determinations. However, the rationale of Demirovic, and the different purposes served by LTD and LWOP benefits, lead to a conclusion that the holding of Demirovic does not apply to a plan administrator's consideration of LWOP benefits. As defendant acknowledges in its reply brief:

> [A] general disability insurance benefit and a waiver of life insurance premium benefit serve significantly different purposes. The former reasonably insures a participant's livelihood when she is deprived of the ability to work and earn income by virtue of illness or injury. The latter allays the burden of premium payments for a different benefit (life insurance) when a participant lacks the functional capacity to work for any pay (nominal or otherwise), rendering it presumptively impossible to pay life insurance premiums.

Doc. #67 at 12. This fundamental difference between the purposes of the two types of benefits undermines plaintiff's argument that Demirovic required defendant to perform a vocational assessment when making its LWOP claim determination.

First, LWOP benefits, unlike LTD benefits, do not implicate "the most important purpose of ERISA," because they do not provide income insurance like LTD benefits. See Demirovic, 467 F.3d at 215. Rather, LWOP benefits merely provide for a waiver of life insurance premium payments. Thus, the rationale underlying Demirovic is inapplicable to the purposes served by LWOP benefits.

Second, the Life Plan's language does not implicate the same concerns expressed by the Second Circuit in the context of

a "general disability plan[.]" <u>Id.</u> at 214 n.4. To reiterate, the Life Plan defines "disabled" as being unable to work "any job for pay or profit[.]" PW86. In <u>Demirovic</u>, the Second Circuit expressed concern that strictly construing the phrase "any gainful employment[,]" without consideration of individual vocational characteristics, "would render the plan's promise of a disability pension hollow for all but the most grievously incapacitated claimants[.]" <u>Demirovic</u>, 467 F.3d at 215. Again, that concern is not applicable in the context of LWOP benefits. Instead, it is <u>reasonable</u> to infer that LWOP benefits are meant to be a short-term benefit for "the most grievously incapacitated claimants[]" who would otherwise have no reasonable opportunity to obtain life insurance on the open market. <u>Id.</u>

Accordingly, the Court does not find that <u>Demirovic</u> applies to defendant's LWOP claim determination in this instance. Accordingly, defendant was not required to undertake a vocational assessment when rejecting plaintiff's LWOP claim.

C. <u>Plaintiff Has not Met his Burden of Establishing that He Is Disabled Under the Terms of the Life Policy</u>

Plaintiff asserts that the evidence he has presented establishes that he is disabled under the terms of the Life Policy. <u>See</u> Doc. #53 at 13-14; <u>see also</u> Doc. #63 at 9.

"The Plaintiff bears the burden of proving by a

42

preponderance of the evidence that []he is disabled within the meaning of the plan." Beardsley, 2020 WL 5441322, at *8. Given the deferential standard of review, and the totality of the evidence in the record, the evidence presented by plaintiff does not establish by a preponderance that he is disabled within the meaning of the Life Policy. Each of the five peer review physicians opined that plaintiff was capable of some work. See Section I.D., supra. Dr. Ortega agreed with Dr. Emad that plaintiff had the capability to perform sedentary work with restrictions. She opined that plaintiff's most difficult symptoms had been present from 2009 through 2017, a time during which plaintiff maintained full-time employment. Additionally, a reasonable reading of Dr. Lichtblau's FCE supports a finding that plaintiff was not, at the time of the report, disabled within the meaning of the Life Policy.

Finally, plaintiff asserts that "intermittent absenteeism is disabling in and of itself[.]" Doc. #63 at 9 (capitalization altered). In support of this assertion, plaintiff relies on the initial opinions of Dr. Ortega, and the opinions of Dr. Berkower. See id. at 9. For reasons previously stated, defendant reasonably rejected these opinions in light of the other evidence of record.[10]

---

[10] Additionally, the cases relied on by plaintiff in support of this argument are distinguishable and not controlling precedent.

> Taken together, the report of an independent medical examiner, the FCE, and the opinion of a consulting physician, constitute substantial evidence upon which to base[] a finding as to disability. While plaintiff's interpretation of the record [could] be reasonable, ... [defendant's] balancing of the evidence does not fall so far outside the range of its discretion as to constitute arbitrary and capricious decision making that it was without reason, unsupported by substantial evidence or erroneous as a matter of law.

Waterbury v. Liberty Life Assurance Co. of Bos., No. 1:03CV01492(DNH), 2005 WL 8169569, at *5 (N.D.N.Y. Dec. 22, 2005), aff'd sub nom. Waterbury v. Liberty Life Assur. Co., 202 F. App'x 477 (2d Cir. 2006).

Thus, for the reasons stated, defendant's determination is supported by substantial evidence, and the decision to deny plaintiff LWOP benefits was not arbitrary or capricious.

**IV.   Conclusion**

Accordingly, for the reasons stated, the Court **AFFIRMS** the administrative decision of defendant to deny LWOP benefits.

---

For example, in Tyndall v. Nat'l Educ. Centers, Inc. of California, 31 F.3d 209 (4th Cir. 1994), the question was "whether an employer violated the Americans with Disabilities Act[.]" Id. at 211. Next, unlike here, the Court in Katzenberg applied the more demanding de novo standard of review. See Katzenberg v. First Fortis Life Ins. Co., 500 F. Supp. 2d 177, 191-93 (E.D.N.Y. 2007). Finally, in Nicolas v. MCI Health & Welfare Plan No. 501, No. 2:05CV00442(TJW), 2008 WL 4533728 (E.D. Tex. Sept. 29, 2008), defendant relied on a report that "ignored objective medical evidence in the record[.]" Id. Here, defendant did not ignore the objective evidence, and in fact, Dr. Kroski considered both the 2017 MRI and Dr. Lichtblau's FCE. See PW821, PW824.

Judgment shall enter in favor of Aetna Life Insurance Company and Hartford Life and Accident Insurance Company. The Clerk of the Court shall close this case.

It is so ordered at Bridgeport, Connecticut, this 20th day of July, 2022.

                              _____/s/_____
                              HON. SARAH A. L. MERRIAM
                              UNITED STATES DISTRICT JUDGE